**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

**TAX DIVAS, LLC** and
**WILLIAMS AND J BOOKKEEPING**
*Individually and on behalf of all others similarly*
*situated*,

        Plaintiffs,

v.

**J.P. MORGAN CHASE BANK** and
**CITIBANK, N.A.,**

        Defendants.

_____/

**CASE NO.** 1:20-cv-05311

**JURY TRIAL DEMANDED**
**INJUNCTIVE RELIEF SOUGHT**

## CLASS ACTION COMPLAINT

Plaintiffs **TAX DIVAS, LLC** and **WILLIAMS AND J BOOKKEEPING** through counsel, bring this Class Action Complaint and Demand for Jury Trial against Defendants **J.P. MORGAN CHASE BANK** and **CITIBANK, N.A.,** alleging claims for declaratory relief, unjust enrichment, conversion, money had and received, and breach of contract. Plaintiffs allege as follows upon personal knowledge as to themselves and their own acts and experiences, and as to all other matters upon information and belief and the investigation of counsel.

## NATURE OF THE ACTION

1.      In March of 2020, as the SARS-CoV-2 virus—the virus that causes the COVID-19 disease (also called "coronavirus")—spread across the United States, Congress passed and President Donald J. Trump signed the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act"), a $2 trillion coronavirus response bill intended to speed relief across the American economy. As businesses shut down in compliance with state and local shelter-in-place orders—or simply in response to a severe decline in demand for services—millions of Americans lost their jobs and the

stock market crashed. The CARES Act was intended to inject money into the economy and help keep businesses and individuals afloat during an unprecedented economic upheaval.

2.      Along with other provisions, the CARES Act created the Paycheck Protection Program ("PPP") to funnel forgivable loans to small businesses. The CARES Act initially authorized up to $349 billion in forgivable loans; that money quickly ran out, and Congress later authorized an additional $310 billion to the program.

3.      Small businesses were invited to apply for PPP funds starting April 3, 2020. Applicants could seek PPP loan funding through certain pre-approved Small Business Administration ("SBA") lenders or through any federally insured depository institution, federally insured credit union, or Farm Credit System institution that chose to participate.

4.      Lenders were compensated for their participation in the program through generous origination fees, paid by the government, that were tied to the amount of each loan. Lenders are eligible to receive (a) 5% for loans up to and including $350,000; (b) 3% for loans of more than $350,000 and less than $2,000,000; and (c) 1% for loans of at least $2,000,000. To receive these substantial origination fees, the lenders took on no risk (because the loan funds were provided by the government) and did little work. Instead, the lenders were paid for funneling money from the SBA to the small business applicants. Lenders were required to certify under penalty of perjury that they were in compliance, and would remain in compliance, with PPP regulations.

5.      The amount of money offered to small business applicants was based on applicants' historical payroll information with specific limitations. But because the purpose of the program was to make money available quickly, lending institutions were not required to independently verify applicants' representations. Instead, small businesses seeking PPP funding were required to make specific attestations and certifications under penalty of serious civil and criminal penalties, including imprisonment and hefty fines.

6.      Congress understood that in order to be able to make timely, truthful, and accurate representations in their PPP applications, many small businesses applying for PPP funding would rely on the assistance and expertise of professionals: accountants, bookkeepers, tax preparers, financial advisors, attorneys, and other such agents (collectively, "Agents").

7.      To incentivize these Agents to assist small businesses with their PPP applications, Congress provided that Agents who assisted small business owners would be compensated through a fee of up to (a) 1% for loans of up to $350,000 (or up to $3,500 for loans in this tier); (b) 0.50% for loans of more than $350,000 and less than $2 million (or up to $9,999 for loans in this tier); or (c) 0.25% for loans of at least $2 million ("Agent Fees"). *See* Business Loan Program Temporary Changes; Paycheck Protection Program, 85 Fed. Reg. 20811-01, 20816 (April 15, 2020) ("PPP Regulations").

8.      The PPP Regulations expressly require that Agent Fees be paid by the lending institution out of the origination fees the lender would receive from the SBA, and prohibit Agents from collecting fees from applicants or taking fees from the PPP loans.

9.      Defendants Chase and Citibank each profited handsomely from their involvement in the PPP.

10.     Chase is the largest PPP lender by net dollars of PPP funding processed according to SBA data.[1] Chase has provided over $29 billion in SBA PPP funds to small businesses, processing at least 269,424 successful PPP loan applications with an average loan size of $107,882. Assuming a conservative origination fee of 1%, Chase received or is entitled to receive over $290 million in origination fees from the SBA (and likely more than that).

11.     Citibank also received a windfall from the SBA. As of April 23, 2020, Citibank had

---

[1] *See* U.S. Small Business Administration, Paycheck Protection Program (PPP) Report Approvals through 06/06/2020 (June 30, 2020), https://www.sba.gov/sites/default/files/2020-07/PPP%20Results%20-%20Sunday%20FINAL-508.pdf.

distributed over $1.1 billion in SBA PPP funds to small businesses.[2] Again assuming the most conservative origination fee, Citibank received or is entitled to receive at least $10 million in origination fees from the SBA—not accounting for any loans distributed since late April.

12.     Plaintiff Tax Divas, LLC ("Tax Divas") is an accounting firm located in Las Vegas, Nevada. Mary Fries, its owner and founder, assisted her small business clients with preparing and submitting PPP loan applications to Defendants. She helped one client apply for funding with Chase, securing a PPP loan in the amount of $200,000; and helped another client apply for funding with Citibank, securing a PPP loan of $5,000.

13.     Plaintiff Williams and J Bookkeeping ("Williams and J") is a bookkeeping firm located in Texas. Jenene Williams, the owner and founder of Williams and J Bookkeeping, assisted her small business client with preparing and submitting a PPP loan application to Defendant Chase. She helped her client secure a PPP loan in the amount of $67,417 through Chase.

14.     Yet despite clear direction from the SBA that the Agent fees "*will be paid by the lender out of the fees the lender receives from the SBA*," and despite certifying under penalty of perjury that it was in compliance and would remain in compliance with PPP regulations, neither of the Defendants has remitted any Agent Fees to Plaintiffs.

15.     Plaintiffs are not alone in their predicament. Upon information and belief, each Defendant has enacted a companywide policy to deny Agents the Agent Fees to which they are entitled. Not one of the Defendants implemented any process for identifying the Agents who assisted borrowers in obtaining PPP loans—likely hoping that the absence of such records would relieve them of the obligation to pay Agents their mandatory fees.

---

[2] Megan Sheets, *How big banks including Chase and Citi helped virtually all of their wealthiest clients get millions of dollars in pandemic aid while up to 94 percent of their smaller customers got none*, The Daily Mail (April 23, 2020), https://www.dailymail.co.uk/news/article-8249807/How-big-banks-including-Chase-Citi-helped-richest-clients-millions-pandemic-aid.html (last accessed July 10, 2020).

16.     Defendants' schemes, which directly contradict the mandate of the PPP Regulations, excluded Agents like Plaintiffs from access to SBA funding

17.     Plaintiffs are also suffering from the economic downturn due to the coronavirus pandemic. They are entitled to the Agent Fees they earned by helping other small businesses apply for forgivable loans. Plaintiffs and other Agents entitled to receive Agent Fees from Defendants have no other recourse to collect their compensation because the PPP regulations assign the responsibility for paying them to lenders alone and prohibit them from collecting compensation from their clients.

18.     Ignoring this clear mandate, Defendants have refused to pay Plaintiffs and other Agents—depriving them of much-needed funds during a time of severe economic hardship, even as Defendants enjoy a windfall.

19.     Plaintiffs thus bring this Class Action Complaint to vindicate their rights and those of other Agents similarly situated, and to recover the Agent Fees to which they are entitled.

## PARTIES

20.     Plaintiff Tax Divas, LLC is a limited liability company with its principal place of business in Las Vegas, Nevada. Its owner and sole shareholder is Mary Fries, a resident and citizen of Nevada.

21.     Plaintiff Williams and J Bookkeeping is a Texas corporation with a principal place of business in Fort Worth, TX.

22.     Defendant J.P. Morgan Chase Bank, N.A., is a national bank headquartered in New York, NY. Chase conducts substantial business in this district, in the State of New York, and throughout the United States.

23.     Defendant Citibank, N.A. is a national bank headquartered in New York, NY. Citibank conducts substantial business in this district, in the State of New York, and throughout the United States.

## JURISDICTION AND VENUE

24.     This Court has subject matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d), because (a) at least one member of the proposed Class is a citizen of a different state than Defendants; (b) the claims of the proposed Class Members exceed $5,000,000 in the aggregate; and (c) none of the exceptions under that subsection apply.

25.     This Court has personal jurisdiction over Defendants because Defendants transact business and commit torts in this district as described herein.

26.     Venue is proper in this District because a substantial part of the events, acts, or omissions giving rise to the claims occurred in this District.

27.     This Court has jurisdiction to grant declaratory relief under 28 U.S.C. § 2201 because an actual controversy exists between the parties as to their respective rights and obligations under the PPP Regulations.

## FACTUAL ALLEGATIONS

28.     Beginning in December 2019, reports began to surface about a novel coronavirus spreading rapidly through Wuhan, China. By March 1, 2020, researchers concluded that over 9,000 people in the United States had already been infected and that the virus had been spreading, undetected, within the United States for six weeks.[3] The World Health Organization declared the COVID-19 outbreak a pandemic on March 11. On March 13, 2020, President Donald Trump declared that the pandemic was of "sufficient severity and magnitude to warrant an emergency declaration for all states, territories and the District of Columbia." California Governor Gavin Newsom issued a stay-

---

[3] *See* Cedars-Sinai, Study Estimates COVID-19 May Have Infected Over 9,000 in U.S. (Mar. 9, 2020), https://www.cedars-sinai.org/newsroom/study-estimates-covid-19-may-have-infected-over-9000-in-us/(last accessed July 10, 2020); Sheri Fink & Mike Baker, Coronavirus May Have Spread in U.S. for Weeks, Gene Sequencing Suggests, *The New York Times* (Mar. 1, 2020), https://www.nytimes.com/2020/03/01/health/coronavirus-washington-spread.html?action=click&module=Top%20Stories&pgtype=Homepage (last accessed July 10, 2020).

at-home order on March 19, ordering the closure of most public spaces and nonessential businesses. California's order was followed by Illinois on March 21, New York on March 22, and dozens of other states and the District of Columbia in the days and weeks that followed.

29.    As the pandemic spread, millions of people in the United States lost their jobs as state and local stay-at-home orders forced businesses to close. Even in states where businesses were allowed to remain open, multiple sectors experienced economic devastation as consumers stayed home to try to counteract the spread of the deadly virus. Demand for goods and services plummeted.

30.    On March 25, 2020, in response to overwhelming pleas for assistance from state and local governments, businesses, and individuals, the United States Senate passed the CARES Act. The House of Representatives approved the bill the following day, and President Trump signed it into law on March 27, 2020. *See* Coronavirus Aid, Relief, and Economic Security Act, Pub. L. 116-136, 134 Stat. 281 (2020). The $2 trillion stimulus bill is the largest stimulus bill in American history.

31.    One of the cornerstones of the CARES Act is the $659 billion loan program for small businesses, the Paycheck Protection Program. *See id.* § 1102, 134 Stat. at 286 (codified at 15 U.S.C. § 636(a) (2020)). In creating the PPP, the federal government recognized that "many small businesses nationwide are experiencing economic hardship as a direct result of the Federal, State, and local public health measures that are being taken to minimize the public's exposure to the virus." PPP Regulations at 20811. The intent of the PPP is to "provide relief to America's small business expeditiously." *Id.*

32.    PPP loans provided small businesses with eight weeks of cash-flow assistance based on historical payroll information. The loans are forgivable up to the full principal amount of the loan and any accrued interest if the borrower uses the loan proceeds for certain purposes and uses at least 75% of the funds for payroll costs. *Id.* at 20813-14. This restriction was implemented "to ensure that the finite appropriations available for these loans are directed toward payroll protection, as each loan that is issued depletes the appropriation, regardless of whether portions of the loan are later forgiven."

*Id.* at 20814. Amounts that are not forgiven will accrue interest at a rate of 1% with a maturity of two years. *Id.* at 20813.

33.     Unlike some other financial assistance provided in the CARES Act, the PPP provided that private lending institutions, rather than government agencies, were to accept loan applications and distribute funds. Lenders approved to make PPP funds included certain SBA-approved lenders, any federally insured depository institution or any federally insured credit union, any Farm Credit System Institution, and certain other financing providers that met specific requirements. *Id.* at 20815.

34.     To compensate lenders for participating in the program, the PPP Regulations provide that SBA will pay lenders substantial origination fees for processing PPP loans: (a) 5% for loans up to and including $350,000 (or up to $17,500 for loans in this tier); (b) 3% for loans of more than $350,000 and less than $2,000,000 (or up to $59,999 for loans in this tier); and (c) 1% for loans of at least $2,000,000. *Id.* at 20816.

35.     In order to expedite the provision of PPP loan funds to businesses in need, the PPP Regulations provide that lenders may rely on borrower certifications and attestations in order to approve a loan application, rather than independently verifying the information provided in the application. *Id.* at 20815-16. The CARES Act specifically provides that lending institutions will not be subject to enforcement actions or penalties if the lender has received a borrower attestation. *Id.* at 20816.

36.     But because the program intentionally did not include any process for verifying borrower representations, the penalties for providing false information are severe. Knowingly making a false statement to obtain a guaranteed loan from SBA is punishable by imprisonment and fines. *Id.* at 20814. It was therefore incumbent upon small business applicants to provide truthful and accurate information in their applications.

37.     PPP applications were to be processed and funded on a "first-come, first-served"

basis. Because the PPP funds were limited, submitting an accurate application as quickly as possible, before the appropriation was depleted, was critical.

38.     Because many small businesses applying for PPP funding would require the assistance of professional accountants, bookkeepers, tax preparers, financial advisors, attorneys, and other agents in order to provide timely, truthful, and accurate representations, Congress recognized that these "agents" would need to be compensated for their work as well. *See* 15 U.S.C. § 636(a)(36)(P)(ii) ("An agent that assists an eligible recipient to prepare an application for a covered loan may not collect a fee in excess of the limits established by the Administrator.").

39.     The SBA, in turn, determined that these reasonable fees were required to be paid by the lender, in specifically delineated amounts. The PPP Regulations include express provisions for the compensation of Agents:

### c.     Who pays the fee to an agent who assists a borrower?

Agent fees will be paid by the lender out of the fees the lender receives from SBA. Agents may not collect fees from the borrower or be paid out of the PPP loan proceeds. The total amount that an agent may collect from the lender for assistance in preparing an application for a PPP loan (including referral to the lender) may not exceed:

i. One (1) percent for loans of not more than $350,000;

ii. 0.50 percent for loans of more than $350,000 and less than $2 million; and

iii. 0.25 percent for loans of at least $2 million.

The Act authorizes the Administrator to establish limits on agent fees. The Administrator, in consultation with the Secretary, determined that the agent fee limits set forth above are reasonable based upon the application requirements and the fees that lenders receive for making PPP loans.

*Id.* at 20816.

40.     The SBA also issued a fact sheet that makes clear that Agent Fees must be paid by the lender: "Agent fees will be paid out of lender fees. The lender will pay the agent. Agents may not

collect any fees from the applicant."[4]

41.     Congress and the SBA did not create a particular process or requirement that lenders or Agents were required to follow in order for the Agent to receive its portion of the fee. Creating a uniform process (and requiring all lenders to comply with additional regulations) would have slowed down implementation of the program—when its core purpose was the speedy distribution of funds to businesses—and could have incentivized lenders to prioritize applicants that did not use Agents so that lenders did not have to share their origination fees.

42.     Instead, the SBA left to the discretion of the lender how best to process applications speedily while complying with the regulations requiring them to compensate Agents for the latter's critical role in the program.

43.     But, prior to becoming an approved PPP lender, lenders were required to fill out and sign the "CARES Act Section 1102 Lender Agreement" for each loan.[5] That agreement requires the lender to certify under penalty of perjury that it is "in compliance and will maintain compliance with all applicable requirements of the Paycheck Protection Program, and PPP Loan Program Requirements."

44.     Defendants have each breached their commitment to remain in compliance with PPP Regulations. Defendants have not paid the fees of Agents for their assistance in providing accurate and truthful information on borrowers' applications. Instead, each Defendant is retaining *all* of the origination fees received from SBA for itself despite its obligation to distribute some portion of those fees to Agents. These funds are a windfall to Defendants—making them the recipients of substantial government aid that they do not need and do not deserve.

---

[4] Paycheck Protection Program (PPP) Information Sheet for Lenders (Mar. 31, 2020), https://home.treasury.gov/system/files/136/PPP%20Lender%20Information%20Fact%20Sheet.pdf (last accessed July 10, 2020).

[5] The agreement is available for download at https://www.sba.gov/document/sba-form--cares-act-section-1102-lender-agreement.

45.    Defendants did not implement any process for identifying the Agents who assisted borrowers in obtaining PPP loans from them. By failing even to ask borrowers whether they utilized the assistance of an Agent, Defendants demonstrated that they did not want to obtain any records of Agent involvement—likely hoping that the absence of such records would relieve them of the obligation to pay Agents their mandatory fees.

46.    Upon information and belief, each Defendant has adopted a company-wide policy of refusing to pay Agents their mandatory fees.

47.    Each Defendant's policy of refusing to pay Agent Fees that are due, that lenders are required to pay, and that *only* lenders are authorized to pay, deprive Agents of their ability to receive the payment they are owed.

48.    Each Defendant processed PPP loan applications and provided SBA loan funding to small business applicants. In return, each Defendant received or will receive hefty origination fees from the SBA as payment. Chase provided small businesses with at least $29 billion in SBA PPP funds as of June 30, 2020. Assuming a conservative origination fee of 1%, Chase received or is entitled to receive over $290 million in origination fees from the SBA.

49.    Citibank also received a windfall from the SBA, and has received or is entitled to receive at least $10 million in origination fees from the SBA.

50.    Each defendant represented on its website that it was processing PPP applications in accordance with PPP Regulations and SBA guidance.

51.    But rather than comply with the PPP Regulations and pay Agents their Agent Fees, each Defendant has decided to keep that money for itself.

## NAMED PLAINTIFFS' FACTS

### *TAX DIVAS*

52.    Tax Divas is owned by Mary Fries, an enrolled agent with the IRS and former IRS

employee who lives in Las Vegas, NV.

53.     Shortly after the CARES Act was enacted, Ms. Fries's clients began contacting her about the PPP. Ms. Fries quickly became familiar with the PPP because she is a member of the National Society of Tax Professionals and volunteers for its helpline. She has also taken courses about the PPP to remain informed about updates and changes. Ms. Fries was thus well positioned to assist her clients with their applications.

54.     One of Ms. Fries's clients, the owner of a contracting business that provides drywall and painting services (the "Contractor") contacted Ms. Fries for assistance with a PPP application in early April. The Contractor came to Ms. Fries's office, where she assisted him with reviewing, assembling, and calculating the financial information necessary for the PPP application. Thanks to her assistance, the Contractor was able to apply for and receive a PPP loan of $200,000 from Chase.

55.     The Chase application did not include a field for asking whether the applicant was assisted by an Agent. Thus, Ms. Fries asked the Contractor to contact Chase and ask what information they needed from so that they could pay Tax Divas an Agent Fee. Chase told the Contractor that Chase did not pay Agent Fees and thus it did not need any information from Ms. Fries or Tax Divas.

56.     Based on the size of the loan and the PPP regulations, Chase was entitled to receive origination fees from the SBA of $10,000.

57.     Also based on the PPP Regulations, Tax Divas was entitled to Agent Fees of $2,000, which should have been paid from the origination fees that Chase received.

58.     But to date, Tax Divas has not received any compensation for its substantial assistance with its client's PPP loan application—assistance that inured to the benefit of Chase, which received a windfall in origination fees from the SBA. Instead, Chase's policy is not to ask whether Agents assisted with PPP loan applications and not to pay Agents the fees they are entitled to under the PPP Regulations.

59.     Tax Divas has suffered financial harm as a result of Chase's unlawful and unfair actions by being deprived of statutorily mandated compensation for professional services.

60.     Tax Divas has no recourse because it is barred from receiving compensation from its clients.

61.     Tax Divas also helped a client apply for funding from Citibank. Also in early April, a client that owns a small scooter rental startup (the "Scooter Rental") in Las Vegas asked Ms. Fries to help with a PPP application.

62.     Ms. Fries helped the Scooter Rental gather all of the financial information necessary for the PPP application. Thanks to her assistance, the Scooter Rental was able to apply for and receive a PPP loan of $5,000 from Citibank.

63.     The Citibank application did not include a field for asking whether the applicant was assisted by an Agent. Thus, Ms. Fries asked the Scooter Rental to contact Citibank and ask what information they needed from so that they could pay Tax Divas an Agent Fee. Citibank told the Scooter Rental that Citibank did not pay Agent Fees and thus it did not need any information from Ms. Fries or Tax Divas.

64.     Based on the size of the loan and the PPP regulations, Citibank was entitled to receive origination fees from the SBA of $250.

65.     Also based on the PPP Regulations, Tax Divas was entitled to Agent Fees of $50, which should have been paid from the origination fees that Citibank received.

66.     But to date, Tax Divas has not received any compensation for its substantial assistance with the PPP loan application—assistance that inured to the benefit of Citibank, which received a windfall in origination fees from the SBA. Instead, Citibank's policy is not to ask whether Agents assisted with PPP loan applications and not to pay Agents the fees they are entitled to under the PPP Regulations.

67.     Tax Divas has suffered financial harm as a result of Citibank's unlawful and unfair actions by being deprived of statutorily mandated compensation for professional services.

## WILLIAMS AND J

68.     Williams & J is owned by Jenene Williams, a bookkeeper based in Fort Worth, TX. Ms. Williams has been in business since 2008 and assists several small business clients with their tax filings and books.

69.     After the coronavirus began to spread and businesses began to close, Ms. Williams began researching resources to assist her clients, including the PPP. Since the CARES Act was enacted, Ms. Williams has spent substantial time and resources educating herself about the PPP and its requirements.

70.     In May 2020, one of Williams and J's clients contacted Ms. Williams for assistance with a PPP application to Chase. The client wanted to apply through Chase because he already had a business account with Chase.

71.     Ms. Williams spent approximately three days gathering the client's payroll and other financial information to assist with the PPP application. She provided the client with all of the information that the company needed for the application. When it came time for the client to prepare the application, Ms. Williams spoke with the owner over the phone while he was filling in the fields to explain in real-time what information he should input.

72.     The Chase application did not include a field for asking whether the applicant was assisted by an Agent.

73.     Based on the size of the loan and the PPP regulations, Chase was entitled to receive origination fees from the SBA of $3,370.

74.     Also based on the PPP Regulations, Williams & J was entitled to Agent Fees of $674, which should have been paid from the origination fees that Chase received.

14

75.     But to date, Williams & J has not received any compensation for her substantial assistance with the PPP loan application—assistance that inured to the benefit of Chase, which received a windfall in origination fees from the SBA. Instead, Chase's policy is not to ask whether Agents assisted with PPP loan applications and not to pay Agents the fees they are entitled to under the PPP Regulations.

76.     Williams & J has suffered financial harm as a result of Chase's unlawful and unfair actions by being deprived of statutorily mandated compensation for professional services.

## CLASS ACTION ALLEGATIONS

77.     Plaintiffs Tax Divas and Williams & J bring this action on behalf of themselves and the following Class and Subclasses:

**Chase Class: All persons and entities in the United States who (1) served as an Agent[6] for a person or entity who applied for and received a PPP loan through Chase and (2) were not paid an Agent Fee by Chase.[7]**

**Chase Texas Subclass** (by Plaintiff Williams & J)**: All persons and entities in Texas who (1) served as an Agent for a person or entity who applied for and received a PPP loan through Chase and (2) were not paid an Agent Fee by Chase.**

**Chase Nevada Subclass** (by Plaintiff Tax Divas)**: All persons and entities in Nevada who (1) served as an Agent for a person or entity who applied for and received a PPP loan through Chase and (2) were not paid an Agent Fee by Chase.**

78.     Plaintiff Tax Divas also brings this action on behalf of itself and the following Class and Subclass:

---

[6] For purposes of all of the proposed classes and subclasses, "Agent" refers to the term "agent" as it is used in Business Loan Program Temporary Changes; Paycheck Protection Program, 85 Fed. Reg. 20811-01, 20816 (April 15, 2020), and the Paycheck Protection Program (PPP) Information Sheet for Lenders (Mar. 31, 2020),
https://home.treasury.gov/system/files/136/PPP%20Lender%20Information%20Fact%20Sheet.pdf (last accessed July 10, 2020).

[7] For purposes of all of the proposed classes and subclasses, "Agent Fee" refers to the agent fees described in Business Loan Program Temporary Changes; Paycheck Protection Program, 85 Fed. Reg. 20811-01, 20816 (April 15, 2020).

**Citibank Class: All persons and entities in the United States who (1) served as an Agent for a person or entity who applied for and received a PPP loan through Citibank and (2) were not paid an Agent Fee by Citbank.**

**Citibank Nevada Subclass: All persons and entities in Nevada who (1) served as an Agent for a person or entity who applied for and received a PPP loan through Citibank and (2) were not paid an Agent Fee by Citibank.**

79.     The class definitions are subject to modification, including the addition of one or more subclasses, based on facts obtained in discovery.

80.     Excluded from the Classes[8] are the Defendants; any entities in which any Defendant has a controlling interest; their agents and employees; and any Judge to whom this action is assigned and any member of such Judge's staff and immediate family.

81.     Plaintiffs propose that they be appointed class representatives.

82.     Plaintiffs and the Classes have been harmed by Defendants' acts.

83.     Numerosity is satisfied. Upon information and belief, there are thousands of Class Members.  Individual joinder of these persons is impracticable.

84.     There are questions of law and fact common to Plaintiffs and the Classes, including, but not limited to:

      a.  Whether Defendants' conduct violates the CARES Act or its implementing regulations;

      b.  Whether Defendants are required to compensate Plaintiffs from the origination fees they are entitled to receive or have received from SBA through the PPP;

      c.  Whether Defendants have a policy and/or practice of declining to pay Agents for their participation in the PPP;

      d.  Whether Defendants' conduct was unfair;

---

[8] As used herein, the term "Class" encompasses the Chase Class and the Citibank Class. "Class Members" means members of the Chase Class and the Citibank Class.

e.   Whether Plaintiffs and the Class Members are third-party beneficiaries of Defendants' contract with the SBA;

f.   Whether Defendants breached their contracts with SBA;

g.   Whether Defendants were unjustly enriched;

h.   Whether Defendants exercised wrongful control over Plaintiffs' and the Class Members' property;

i.   Whether Defendants received money that was intended to be used for the benefit of Plaintiffs and the Class Members;

j.   Whether Plaintiffs and the Class Members are entitled to restitution of funds unlawfully withheld;

k.   Whether Plaintiffs and the Class Members are entitled to injunctive or declaratory relief; and

l.   Whether Plaintiffs and the Class Members are entitled to damages.

85.    Plaintiffs' claims are typical of the claims of Class Members.  Plaintiffs and the Class Members were all harmed when Defendants refused to pay them Agent Fees under the PPP. Plaintiffs' claims are not antagonistic to the claims of other Class Members.

86.    Plaintiffs are adequate representatives of the Classes because their interests do not conflict with the interests of the Class Members. Plaintiffs will fairly and adequately protect the interests of the Classes.

87.    Plaintiffs have hired counsel that is skilled and experienced in class actions, including numerous complex class actions against financial institutions, and are adequate class counsel capable of protecting the interests of the Class Members.

88.    Common questions of law and fact predominate over questions affecting only individual Class Members, and a class action is the superior method for fair and efficient adjudication

of this controversy. The damages suffered by individual Class Members are likely relatively small, and it would be difficult and not economical for individual Class Members to pursue complex litigation against Defendants to recover the fees to which they are entitled. Further, individual litigation would increase the delay and expense to all parties due to the complex legal and factual issues presented in the Complaint. A class action provides easier management, the benefits of single adjudication, and economies of scale.

## CAUSES OF ACTION

### COUNT I
**Declaratory Relief**
**28 U.S.C. § 2201**
**On behalf of all Plaintiffs and the Chase Class against Chase; and**
**On behalf of Plaintiff Tax Divas and the Citibank Class against Citibank**

89.    Plaintiffs incorporate by reference paragraphs 1 through 88 set forth above.

90.    Plaintiffs and the Class Members are "agents" as defined by the PPP Regulations and publications pertaining to the PPP.

91.    Plaintiffs and the Class Members assisted clients with preparing applications for, and applying for, PPP loans, which were funded by one or more of the Defendants through the PPP.

92.    The PPP Regulations provide that Plaintiffs and the Class Members must be compensated for that work by Defendants, from the fees that Defendants received from the SBA as compensation for participation in the program.

93.    Defendants have both refused to make these payments.

94.    An actual controversy has arisen between Plaintiffs and the Class Members, on the one hand, and one or more of the Defendants, on the other, because each Defendant by its refusal to pay Agent Fees to Plaintiffs and the Class Members denies that it is obligated to do so.

95.    Plaintiffs and the Class Members seek a declaration in accordance with PPP Regulations and the Declaratory Judgment Act that Defendants are obligated to set aside money to

18

pay, and to pay, Agents in accordance with PPP Regulations for work performed on behalf of a client in relation to the preparation and/or submission of a PPP loan application that resulted in a funded PPP loan.

## COUNT II
### Unjust Enrichment
### On behalf of all Plaintiffs and the Chase Class against Chase; and
### On behalf of Plaintiff Tax Divas and the Citibank Class against Citibank

96.     Plaintiffs incorporate by reference paragraphs 1 through 88 set forth above.

97.     Defendants each received a benefit in the form of origination fees paid by the SBA in connection with funded PPP loans.

98.     Under the PPP Regulations and SBA guidance, a portion of those fees were to be paid to Agents, like and including Plaintiffs and the Class Members, who assisted with their clients' successful PPP applications.

99.     Each Defendant is refusing to pay those Agent Fees, in contravention of PPP Regulations.

100.     Each Defendant is thus benefiting in the form of millions of dollars of origination fees, to the detriment of Agents including Plaintiffs and the Class Members, by keeping the Agent Fees for itself. Defendants know that they received or will receive these benefits by virtue of their participation in the PPP Program and their certification of compliance with PPP Regulations.

101.     It would be inequitable, unjust, and unfair to permit Defendants to retain the Agent Fees owed to Plaintiffs and the Class Members under the PPP Regulations and SBA guidance. Plaintiffs and the Class Members can reasonably expect to receive payment that is mandated by federal regulation. This is particularly so in the context of a global pandemic that has rattled the economy.

102.     Each Defendant must disgorge the portion of any and all PPP origination fees that is owed to Plaintiffs and the Class Members in their capacities as Agents.

**COUNT III**
**Conversion**
**On behalf of all Plaintiffs and the Chase Class against Chase; and**
**On behalf of Plaintiff Tax Divas and the Citibank Class against Citibank**

103.    Plaintiffs incorporate by reference paragraphs 1 through 88 set forth above.

104.    Under the PPP Regulations and SBA guidance, Plaintiffs and the Class Members, as Agents, have a right to Agent Fees that must be paid from the lender origination fees provided to each Defendant by the SBA in exchange for processing the funded PPP loan applications of Plaintiffs' and the Class Members' clients.

105.    The PPP Regulations state that "Agent fees *will* be paid out of lender fees" and create specific guidelines for the amount that should be paid. The SBA determined that the Agent Fee limits are "reasonable based upon the application requirements and the fees that lenders receive for making PPP loans."

106.    The PPP Regulations also unequivocally state that Agents "may not collect fees from the applicant," making it clear that the lenders are responsible for paying the Agent Fees.

107.    Plaintiffs and the Class Members assisted their clients with applications for PPP loans that were subsequently funded. Due to Plaintiffs' and the Class Members' efforts, their clients were awarded PPP loans through applications to one or more of the Defendants. As such, Plaintiffs and the Class Members have a right to immediate possession of Agent Fees to be paid by whichever Defendant funded their clients' loan(s).

108.    Although Plaintiffs and the Class Members are entitled to Agent Fees under the PPP Regulations, each Defendant has refused to provide those fees to Plaintiffs and the Class Members. Even if Plaintiffs and the Class Members had requested their Agent Fees, the Defendants would have each refused the requests, because each Defendant has adopted a company-wide policy of refusing to pay Agent Fees.

109.    By retaining the Agent Fees for themselves, each Defendant has maintained wrongful

control over Plaintiffs' and the Class Members' property, inconsistent with their entitlements under the PPP Regulations.

110.    Each Agent Fee to which Plaintiffs and the Class Members are entitled is a specific, identifiable sum, according to the amount of the PPP loan funded and the applicable PPP Regulation. Plaintiff Tax Divas, is entitled to $2,000 which has been wrongfully withheld by Chase and $50 which has been wrongfully withheld by Citibank. Plaintiff Williams and J is entitled to $674, which has been wrongfully withheld by Chase.

111.    Plaintiffs and the Class Members have been injured by Defendants' wrongful exercise of dominion over their property

**COUNT IV**
**Money Had and Received**
**On behalf of all Plaintiffs and the Chase Class against Chase; and**
**On behalf of Plaintiff Tax Divas and the Citibank Class against Citibank**

112.    Plaintiffs incorporate by reference paragraphs 1 through 88 set forth above.

113.    Under the PPP Regulations and SBA guidance, Plaintiffs and the Class Members, as Agents, have a right to Agent Fees that must be paid from the lender origination fees provided to each Defendant by the SBA in exchange for processing the funded PPP loan applications of Plaintiffs' and the Class Members' clients.

114.    The PPP Regulations state that "Agent fees *will* be paid out of lender fees" and create specific guidelines for the amount that should be paid. The SBA determined that the Agent Fee limits are "reasonable based upon the application requirements and the fees that lenders receive for making PPP loans."

115.    The PPP Regulations also unequivocally state that Agents "may not collect fees from the applicant," making it clear that the lenders are responsible for paying the Agents Fees.

116.    Plaintiffs and the Class Members assisted their clients with applications for PPP loans that were subsequently funded. Due to Plaintiffs' and the Class Members' efforts, their clients were

awarded PPP loans through applications to one or more of the Defendants. As such, Plaintiffs and the Class Members have a right to immediate possession of Agent Fees to be paid by whichever Defendant funded their clients' loan(s).

117.    Although Plaintiffs and the Class Members are entitled to Agent Fees under the PPP Regulations, each Defendant has refused to provide those fees to Plaintiffs and the Class Members.

118.    Each Defendant received benefits in the form of money that was intended to be paid to Plaintiffs and the Class Members when it received origination fees, a portion of which were earmarked for Plaintiffs and the Class Members as Agent Fees under the PPP Regulations. Defendant had knowledge of these benefits by virtue of their participation in the PPP and their certification of compliance with PPP Regulations.

119.    Instead of paying that money to Plaintiffs and the Class Members, each Defendant kept that money for itself. Thus, the money was not used for Plaintiffs' or the Class Members' benefit.

120.    Defendant has not given the money to Plaintiffs or the Class Members.

121.    In equity and good conscience, the Agent Fees should be paid by Defendants to Plaintiffs and the Class Members.

## COUNT V
### Breach of Contract – Third Party Beneficiary
### On behalf of all Plaintiffs and the Chase Class against Chase; and
### On behalf of Plaintiff Tax Divas and the Citibank Class against Citibank

122.    Plaintiffs incorporate by reference paragraphs 1 through 88 set forth above.

123.    Upon information and belief, in order to process PPP loan applications, each Defendant entered into an agreement with the SBA.

124.    The agreements required that each Defendant adhere to the PPP Regulations and certify compliance with them under penalty of perjury. The agreements between the SBA and each Defendant thus incorporate the PPP Regulations by reference.

125.    As part of the agreement, each Defendant certified, under penalty of perjury, that it

22

was in compliance and would remain in compliance with PPP Regulations that specifically require PPP lenders to pay the fees of any Agent that assists with successful PPP applications, within limits.

126.    Plaintiffs and the Class Members were intended beneficiaries of the agreement between the SBA and the Defendants. Thus, Plaintiffs and the Class Members may enforce the promises directly made for them, including the promise to comply with PPP Regulations mandating lenders, including Defendants, to pay Agent Fees.

127.    The acts of the SBA and the Defendants created a duty and established privity between each Defendant on the one hand, and Agents, including Plaintiffs and the Class Members, on the other.

128.    Nevertheless, Defendants have each breached the agreements by adopting policies of not paying Agent Fees and refusing to pay Plaintiffs and the Class Members the Agent Fees to which they are entitled, conduct that violated the PPP Regulations.

129.    By refusing to pay Agent Fees in accordance with PPP Regulations, Defendants are in violation of the terms of their agreements with the SBA, thereby damaging Plaintiffs and the Class Members.

## COUNT VI
### Violations of New York General Business Law § 349
**On behalf of all Plaintiffs and the Chase Class against Chase; and
On behalf of Plaintiff Tax Divas and the Citibank Class against Citibank**

130.    Plaintiffs incorporate by reference paragraphs 1 through 88 set forth above.

131.    Plaintiffs and the Class Members are "persons" within the meaning of N.Y. Gen. Bus. L. § 349(h).

132.    Gen. Bus. Law § 349(a) prohibits the use of deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in the state of New York.

133.    As alleged herein, Defendants engaged in deceptive acts and practices in the form of misrepresentations on their websites, that they were processing the applications submitted in

conformity with PPP rules and according to SBA guidance. However, neither Defendant has paid the Agent Fees required by the PPP Regulations and SBA Guidance to Plaintiffs and the Class Members. These misrepresentations and omissions in the conduct of business and provision of services violate Gen. Bus. Law § 349.

134.    Defendants knew or should have known that their acts, practices, statements, policies, correspondence, and representations were likely to deceive and mislead Plaintiffs and the Class Members.

135.    Plaintiffs and the Class Members were injured as a result of Defendants' violations of Gen. Bus. Law § 349 because they were deprived of the Agent Fees to which they are entitled.

136.    Defendants' deceptive acts and practices caused damages and injury to Plaintiffs and the Class Members.

137.    Defendants' refusal to pay Agent Fees in accordance with applicable regulations is a matter of public interest because the PPP loans, and the SBA origination fees that Defendants receive, are paid for by taxpayers.

138.    Plaintiffs and the Class Members ask the Court to award equitable relief, restitution, civil penalties, punitive damages, attorneys' fees, consequential damages, and all other damages available at law.

### COUNT VII
**Violations of Nevada Deceptive Trade Practices Act**
**On behalf of Plaintiff Tax Divas and the Chase Nevada Subclass against Chase; and**
**On behalf of Plaintiff Tax Divas and the Citibank Nevada Subclass against Citibank**

139.    Plaintiff Tax Divas incorporates by reference paragraphs 1 through 88 set forth above.

140.    The Nevada Deceptive Trade Practices Act ("NDTPA") prohibits deceptive trade practices.

141.    A person engages in a deceptive trade practice if the person knowingly makes a false representation in a transaction. Nev. Rev. Stat. § 598.0915(15).

24

142.    A person engages in a deceptive trade practice if the person knowingly misrepresents the legal rights, obligations or remedies of a party to a transaction. Nev. Rev. Stat. § 598.092(8);

143.    As alleged herein, Defendants engaged in deceptive acts and practices in the form of misrepresentations on their websites, that they were processing the applications submitted in conformity with PPP rules and according to SBA guidance—including the obligation to pay Agent Fees. However, neither Defendant has paid the Agent Fees required by the PPP Regulations and SBA Guidance to Plaintiffs and the Class Members. These misrepresentations and omissions in the conduct of business and provision of services violate the NDTPA.

144.    Defendants knew or should have known that their acts, practices, statements, policies, correspondence, and representations were likely to deceive and mislead Plaintiffs and the Class Members. Defendants knew that they were required to pay Agent Fees because they certified compliance with the PPP Regulations that contain that requirement.

145.    Plaintiffs and the Class Members were injured as a result of Defendants' violations of the NDTPA because they were deprived of the Agent Fees to which they are entitled.

146.    Defendants' deceptive acts and practices caused damages and injury to Plaintiffs and the Class Members.

147.    Defendants' refusal to pay Agent Fees in accordance with applicable regulations is a matter of public interest because the PPP loans, and the SBA origination fees that Defendants receive, are paid for by taxpayers.

148.    Plaintiffs and the Class Members ask the Court to award equitable relief, restitution, civil penalties, punitive damages, attorneys' fees, consequential damages, and all other damages available at law. Nev. Rev. Stat. § 41.600.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of the Classes, respectfully pray that this

Court:

a.      Enter an order certifying the Classes, appointing Plaintiffs as the Class Representative, and appointing Plaintiffs' counsel as Class Counsel;

b.      Enter an order declaring that Defendants' actions and omissions, described above, are unlawful;

c.      Award all actual, consequential, compensatory, punitive, and statutory damages as available under law, including without limitation actual damages for past, present, and future expenses caused by Defendants' misconduct, lost time and interest, and all other damages suffered;

d.      An award of pre- and post-judgment interest as allowed by law;

e.      An award of reasonable attorneys' fees and expenses;

f.      The entry of injunctive and declaratory relief as necessary to protect the interests of Plaintiffs and the Classes; and

g.      Such other and further relief as the Court deems reasonable and just.

**PLAINTIFFS DEMAND A TRIAL BY JURY ON ALL ISSUES SO TRIABLE.**

Dated: July 10, 2020                  Respectfully submitted,

                                          */s/ Katherine M. Aizpuru*

                                    Katherine M. Aizpuru (N.Y. Bar No. 5305990)
Hassan A. Zavareei*
Andrea R. Gold*
TYCKO & ZAVAREEI LLP
1828 L Street NW, Suite 1000
Washington, D.C. 20036
Telephone: (202) 973-0900
Facsimile: (202) 973-0950
hzavareei@tzlegal.com
agold@tzlegal.com
kaizpuru@tzlegal.com

*Counsel for Plaintiffs and the Putative Classes*

*\*Pro hac vice applications to be submitted*

26